## ADAMS v. OKLAHOMA CITY.

No. 1843, Okla. T.    Opinion Filed March 19, 1908.

(95 Pac. 975.)

1.  MUNICIPAL CORPORATIONS — Streets — Establishment of Grade—Damages. Where a city, in the exercise of its lawful authority (section 443, Wilson's Rev. & Ann. St. 1903), first establishes a grade on a street, and grades same with reasonable skill and care, it incurs no liability for consequential damages to abutting or adjacent proprietors.

2.  SAME—Change in Grade—Compensation to Abutting Owners. It was the intention of the Legislature (section 443, Wilson's Rev. & Ann. St. 1903) to provide compensation only for owners of abutting property having permanent improvements erected thereon, where change was made in the permanent grade previously established by lawful authority.

(Syllabus by the Court.)

*Error from the District Court, Oklahoma County; before J. K. Beauchamp, Judge.*

Action for damages by M. A. Adams against the city of Oklahoma City. Judgment for defendant, and plaintiff brings error. Affirmed.

On the 30th day of October, 1904, plaintiff filed her petition in the district court of Oklahoma county, Oklahoma Territory, against the city of Oklahoma City; the parties in the court below occupying the same relative positions in this court. Plaintiff alleged that the defendant was an organized and existing municipal corporation under the laws of said territory of the first class, containing a population in excess of 3,000; that she was the owner of lots numbered 4, 5, and 6, in block numbered 51, in Maywood addition to said city, said lots being bounded on the north by Fourth street and on the west by Stiles avenue; that before any improvements were made on said lots the grades on said streets along the north and west of said lots were permanently established by the city authorities, and afterwards a building was erected on plaintiff's lots conforming to said grades, and above the lines of such grades so permanently established by said city authorities; that a natural water course or ravine ran from the north to the south near the east end of said lots, which carried off all the surface water that fell, and drained said lots, leaving them dry, although they were in a low place; that said lots were filled to conform to said grades, and, had said streets been left as first established, said lots would have been dry, and all surface water would have been drained therefrom into the gutters of the streets, and would have been carried off without flooding the property of the plaintiff, which was used as a residence, having five rooms and a large basement, extending under the whole of said house, the same being divided into two rooms, one a storeroom and the other being used for a kitchen and dining room, there being three rooms above said basement which were living rooms; that afterwards, in the year 1904, said city caused the grade of said Fourth street along the north line of said lots, and said Styles avenue along the west, to be raised to the height

of 18 inches above said first grade, and caused said streets to be filled to the height of said last grade, leaving the said lots and residence of the plaintiff about 15 inches below the grade of said street in a depression, where the flood waters had no means to flow off and no outlet to escape, and same flowed on and over plaintiff's lots, the water being dammed up without leaving any outlet for same across the east end of said lots; that before making said change in said grade the defendant wholly failed and neglected to make due compensation as required by law for damages sustained by reason of said changes. Plaintiff further alleged that about the 10th of June, 1904, a severe rain fell in said city, and by reason of the unlawful change in said grade in filling or grading said streets the water was dammed up in said water course, causing a large body of water to form in said street and break through the grade therein, and by reason thereof the property of plaintiff was overflowed, and her household goods and personal property damaged to the value of $115.80, and said house and lots have been damaged by reason of the change in the grade of said streets in the sum of $1,500; the sum total of said damages being $1,615.80.

The defendant, on the 24th day of October, 1904, appeared through its attorney and answered, admitting that it was a municipal corporation and that the plaintiff was the owner of the lots as alleged in her petition, but otherwise denied all the allegations of said petition.

The evidence on the part of the plaintiff was to the effect that said lots faced west on Stiles avenue, a street running north and south in Maywood addition, and were bounded on the north by Fourth street, running east and west, and on the east by an alley running north and south. On said lots plaintiff had erected two houses, one near the west end and the other near the center thereof, near what had the appearance of a ravine or drain according to the plaintiff's testimony, which was in words and figures as follows:

"Q. Was there any source by which the surface water was

passed off through these lots? A. Yes; there was. Q. What was it? Just state it. A. Well, it had the appearance of a ravine. That is what I would call it. I don't know what else. It was natural. Q. Was there any bank to it? A. No, sir; I would not think so. Q. Any indention in the ground, was it? State what it looked like. Did it just run smooth over the earth? A. No, sir. Q. Well, what was it? Describe it. A. It may at one time have been a water channel. Q. I wish you to describe the way the water ran there. A. The water ran in this draw. Q. Well, now, describe that draw. Was it elevated or depressed in the ground? A. It was a depression. It was lower than the other part of the country, or else I would not call it a draw. Q. Well, were the banks sloping, or square, or what? A. The banks were sloping. Q. Now, on Fourth street, was there any opening for the letting off of the water into the street? A. Yes. Q. What was it? A. There was a small bridge in the street, and under that, of course, was a passage. Q. What became of the water that came down from the north and east through the ravine? A. It flowed off in a few hours. Q. Where did it flow? A. It flowed in a southwesterly direction from our premises into Stiles avenue. Beyond that I don't know."

This ravine or draw headed near Lincoln schoolhouse, about a half mile north of the premises in controversy, came down from the north, and entered the block north of the one in which plaintiff's lots were situated, about the center thereof east and west, and came down through said block near the center, and crossed said Fourth street near the alley at the east end of plaintiff's lots, and went on south to the back end of her lots until it reached the south line thereof, where the same had been deflected into a ditch, extending along the south line of her lots out into Stiles avenue, which was at the west end of said lots, where the water flowed into said avenue. Said depression or draw was not over one-half mile in length, and drained an area not to exceed 160 acres of surface waters caused by rains falling thereon. Said draw or drain had changed its place at times, occasioned by the improvement of lots. There is nothing to show that the draw existed prior to the founding or extending of the limits of the city. It is probable that the laying off and improving of the lots, and the con-

sequent throwing off of surface water, produced this draw or drain, and the consequent change of location of same at times. There was a channel or ditch across the block north of the one on which plaintiff's lots were situated, and also across Fourth street at the east end of plaintiff's lots, to wit, in some places to a width of about 10 feet, and in some places to a depth of about 6 feet; but at various places wagons and vehicles could cross with convenience.  Water never stood in this ravine, draw or drain any length of time, but ran off rapidly immediately after each rain.  The proof tended to show that the ditch on the south of said lots was of sufficient capacity to carry off the surface water of ordinarily heavy rains without material injury to her lots; that prior and up to the spring of 1904 some improvement had been made upon said street, and a bridge spanning said draw or ravine had been sufficient to permit all surface water in time of rains to pass thereunder has been constructed.  Plaintiff had caused the west portion of her lots to be filled up to a height above Fourth street, as it then existed, though the evidence shows that no grade was ever established by the authorities of the city until the spring of 1904, and that a portion of her lots were comparatively dry, and had never been injured by any flood water or heavy rains, although said lots were on the lowlands.  In the spring of 1904 defendant established a grade on Fourth street by ordinance, the first grade established on the authority of said city, which raised the grade on said Fourth street to a height of about 4 to 6 feet above the level of plaintiff's lots; and the defendant caused said street to be filled to the height of said grade.  The bridge across said draw or ravine was taken out, and a dirt embankment thrown up, and no provision made for the flow of such surface water accumulating north of Fourth street; it appearing that it was the intention to divert said surface water as flowed down from the north around at the north end of Fourth street to Stiles avenue west of plaintiff's lots, where it would flow south down said avenue to the lowlands southward, thus taking it out of its usual course down said draw.

On the 11th day of June, 1904, after the grade had been established by ordinance under the authority of the city, and whilst the construction or grading of the street was being completed, there fell a heavy rain, resulting in the formation of a lake in said draw north of Fourth street extending north to Fifth street through the entire block on , which plaintiff's lots were situated, and same was held back by the embankment erected by defendant in grading Fourth street; that said back water was of the width of about 8 or 10 rods, and at places was 20 feet in depth. As a result of the raising of said grade and the obstruction of said water, and in consequence of the said heavy rain, a large body of water was collected on the north side of Fourth street, until it came to a point opposite plaintiff's house, where it broke over the grade embankment in the street in several places and flowed to the depth of 2 or 3 feet, thereby overflowing the plaintiff's house, flooding her basement, washing out the household goods, and in other ways injuring her property.

The trial of this cause was begun on the 21st day of November, 1904. At the conclusion of the introduction of plaintiff's testimony, defendant filed a demurrer to such evidence, which was sustained by the court. The plaintiff properly reserved her exceptions. Thereafter, within the prescribed time, plaintiff filed her motion for a new trial, assigning as ground therefor the sustaining of said demurrer and the rendering of judgment in favor of the defendant against the plaintiff, to all of which exceptions were properly saved, and the cause is now properly before this court on petition in error.

*Hayes, Thorpe & Thorpe,* for plaintiff in error.
*T. G. Chambers,* for defendant in error.

WILLIAMS, C. J. (after stating the facts as above). The defendant in plaintiff's petition is not charged with negligence, nor does the evidence tend to show such, in the construction or grading of the street; neither is there any claim that it intentionally collected the water in a body, or by drains or sewers threw it upon

the premises of the plaintiff. The only question necessary to determine in this case is: Can the city, in first establishing a grade, and accordingly grading the street, obstruct the flow of surface water without incurring liability, where there is no allegation or contention of any negligence in the establishment or grading of such street? Section 443, vol. 1, Wilson's Rev. & Ann. St. 1903, is as follows:

"The mayor and council of cities of the first class of this territory, having a population of more than three thousand, as shown by the last territorial or federal census, are hereby empowered to establish and change the grade of all streets, avenues, lanes, alleys and other public places, provided that any change of a permanent, established grade shall not be made without making due compensation to the owners of abutting property having permanent improvements erected thereon with reference to the previously established grade."

This is the latest enactment giving cities of the first class the right to establish and change grades of all streets. The plaintiff in her brief states as follows:

"It may be that we fail to show in the evidence that this was a change of grade from one once established; but nevertheless the other facts alleged in the petition show a diversion of this water from its natural cour se, by which it was thrown over the portions of the lots of Mrs. Adams and about her buildings, where it had never run before, and damaged her thereby."

The decision of this case necessarily depends upon the construction of the words "provided that any change of a permanent, established grade shall not be made without due compensation to the owners of abutting property having permanent improvements erected thereon with reference to the previously established grade." It is often found difficult to limit the language in the enacting clause, so as to admit every exception, and limitation designed to be introduced into such act in its finished state. Hence the utility of the proviso, which is to be construed in connection with the section of which it forms a part, and is substantially an exception, and is not to apply to others unless primarily intended to. In other words, the proviso will be so restricted, in the absence of

anything in its terms, or the subject dealt with, evincing the intention of giving it a broader effect. Its proper function being to limit the language of the Legislature, it will not be deemed intended from doubtful words to enlarge or extend the act or the provision in which it is engrafted, when it follows and restricts an enacting clause. Generally in its purpose and language it is to be strictly construed and limited to subjects fairly within its terms. *"Expressio unius est exclusio alterius."* This is a complete statute. It authorizes the city to establish grades, and also. after having established same, to make changes therein, providing at the same time for compensation to property owners where the city, after having established a permanent grade, changes the same. It especially refrains from providing compensation to property owners from any damage sustained from the original establishment of a grade.

There is good reason for the policy that cities should not be liable for damages occasioned in the first establishment of grades. It would discourage public improvements if an entire section of a city were allowed to recover damages from the municipal government for injuries resulting to abutting or adjacent lots on account of grades first established. Cities are built upon tracts of land irrespective of the existing natural conditions; some parts upon elevation, others upon depressions. These must be made to subserve the demands for necessary city improvements. By no other rule or policy could cities reasonably be built with a view to the construction of streets for the necessary travel and the placing of sewerage for the preservation of health, thereby promoting the public comfort and convenience. Elevations must be leveled, and lowlands and depressions raised. Buildings first constructed are erected with an understanding that a change in the physical conditions must take place for the benefit of the entire community. A building is placed upon a hill with a reasonable expectancy that a street is to be cut there, and that such building will in all probability be above the grade when established; and one is put upon a draw or lowland with the reasonable apprehension that a street

will be graded and filled, being raised at least to a grade far above its level. These are the inevitable incidents of improvement, development, and progress. Otherwise no cities could reasonably be built. There would be no boulevards, no parks, no broad streets paved and provided with commensurate sidewalks for the convenience of the public, whether pedestrains, equestrians, or by vehiculation, steam, or electricity; for bankruptcy would overtake the city in its first growth. With any other interpretation in this country there could be no material development or improvement in our cities as to streets and thoroughfares; but we would have narrow irregular streets like those of the Spanish-American countries, without any regard to' grade or surface. Nor is the right of the individual morally encroached upon by such a policy, though "private interest must yield to public accommodation." With the grading of streets, the laying of sewerage and water pipes, the cutting down of hills and filling up of hollows, and the beautifying of cities, there is corresponding increase of value as to space and area. The party having such property, by raising the grade of the lot to that of the street, the value of the same, as a rule, is proportionately increased to amply compensate for all costs in the grading thereof. The values of lots and realty in cities keep corresponding pace with its growth and development, and an outlay for grading of lots to conform to the streets is usually followed by such increment of value as to work no hardship. *Smith v. Corporation of Washington City*, 20 How. (U. S.) 146, 15 L. Ed. 858; *Davis v. County Commissioners*, 153 Mass. 218, 26 N. E. 848, 11 L. R. A. 750; *Alden v. City of Minneapolis*, 24 Minn. 262.

Municipalities are agencies of the commonwealth, created by the sovereignty of the people.

"A Legislature may and often does authorize, and even direct, acts to be done which are harmful to individuals, and which without the authority would be nuisances; but in such a case, if the statute be such as the Legislature has power to pass, the acts are lawful, and are not nuisances, unless the power has been exceeded. In such grants of power a right to compensation for consequential

injuries caused by the authorized erections may be given to those who suffer; but then the right is the creature of the statute. It has no existence without it." (*Transportation Co. v. Chicago,* 99 U. S. 640, 25 L. Ed. 336.)

In the case of *Field v. Township of West Orange,* 36 N. J. Eq. 119, the court says:

"Where damage is done that way by grading the streets under competent authority, there is no responsibility to the injured party."

In the case of *Field v. West Orange,* 46 N. J. Eq. 183, 2 Atl. 236, the court says:

"The Supreme Court has, however, held that where damage results to an individual from the discharge of surface water upon his land, in consequence of a proper power delegated to a municipality to make and grade highways, no legal liability exists."

In the case of *Inhabitants of West Orange v. Field,* 37 N. J. Eq. 601, 45 Am. Rep. 670, the court said:

"As stated in that case (*Durkes v. Town of Union,* 38 N. J. Law, 21), the authorities are quite uniform in holding that no responsibility attaches for damage done by the diversion of surface water by the public authorities, where the diversion is merely incidental to and occasioned by the making or altering of street grades."

In the case of *Alden v. City of Minneapolis,* 24 Minn. 262, "there was a natural depression from all sides," and "a pond" was formed by the accumulation of surface water, with no outlet, and the court says:

"It had the right, as was its duty, to fix the grades of its streets and improve them accordingly, and wholly with reference to the public use and accommodation, and no right of action could accrue against it by reason of any consequential injuries resulting necessarily from the proper execution of this power. *Lee v. City of Minneapolis,* 22 Minn. 13. It was under no obligation, in establishing such grades and making such improvements, to conform them to the special necessities and requirements of plaintiff's abutting property, for the purpose of draining it or preventing the accumulation upon it of mere surface waters. Its clear duty to the public required, as was done in this instance, the

elevation of the grades of Nicollet and Third streets, through this low place of ground to such a height and level above its natural surface as would make them fit and suitable for public use and travel, by keeping them properly drained of such surface waters as usually collected in that locality. If thereby plaintiff's lot was necessarily overflowed during heavy rains, to his injury, it was the misfortune of his situation in occupying premises thus naturally low, and his loss, if any, was *damnum absque injuria.* He had no legal claim upon the city for the construction of any sewer, to serve either as a drain to his premises or as an additional relief to the streets themselves; and hence the omission to build the Hennepin avenue sewer furnished him no just ground for complaint. His proper, if not sole, protection consisted in raising his own lot above the grade line of the street, or in the erection of such walls and embankments as would have effectually prevented any flow upon him from the street. This he could lawfully have done, as he possessed the common-law right of use and enjoyment, in respect to his lot, as fully and to the same extent as the city did in respect to its streets. Each had the right to use and improve, for any legitimate purpose, and in such manner as would protect against the incursion or accumulation of mere surface water. *Barry v. City of Lowell,* 8 Allen (Mass.) 127, 85 Am. Dec. 692; *Franklin v. Fisk,* 13 Allen (Mass.) 211, 90 Am. Dec. 194; *Turner v. Dartmouth,* 13 Allen (Mass.) 291; *Flagg v. Worcester,* 13 Gray (Mass.) 601; *Wilson v. Mayor,* 1 Denio (N. Y.) 595, 43 Am. Dec. 719; *Mills v. Brooklyn,* 32 N. Y. 489; *Imler v. Springfield,* 55 Mo. 119, 17 Am. Rep. 645; *Hoyt v. City of Hudson,* 27 Wis. 656, 9 Am. Rep. 473."

In the case of *Stewart v. City of Clinton,* 79 Mo. 613, the court says:

"It is assumed by the plaintiff that it was the duty of the city to keep a drain or gutter open while the work was being done, so as to prevent the flow of the surface water of the street in and upon the plaintiff's premises, and that this was negligently permitted by the defendant."

It was held that no such duty devolved upon the defendant, citing with approval Dillon on Munic. Corp. § 799:

"Even where the work of grading the streets is entered upon, there is not ordinarily, if ever, any liability to the adjoining

owner growing merely from the nonaction of the corporation in not providing for keeping surface water from property situate below the established grade of the street. The surface flow of the water along the street came in contact with the mouth of the pipe connecting plaintiff's cellar with the street, and thereby ran into the. cellar. This is no more than to say that when defendant altered the grade of its streets it became its duty to provide ditches or other conduits for the surface water flowing along the street, so as to prevent it from running into plaintiff's cellar, the servient property; and this, too, when the water found its way into his cellar by means of an artificial passway which he had constructed from his private property to the public street. This injury he could easily have prevented by closing up his pipes and providing other means of escape for water accumulating in his cellar otherwise than from the graded street. When he thus appropriated, uninvited, the public thoroughfare for an easement to drain his cellar upon, he did so subject to the paramount right of the municipality to change the grade of this highway to suit the public convenience, to . which it was primarily dedicated."

In the case of *Freburg v. City of Davenport*, 63 Iowa, 119, 18 N. W. 707, 50 Am. Rep. 737, the court, citing 2 Dillon on Municipal Corporations (3d Ed.) §§ 1051, 1044, 1043, 1042, and 1041, says:

"But since surface water is a common enemy, which the lot owner may fight by raising his lot to grade or in any other proper manner, and since the municipality has the undoubted right to bring its streets to grade, and has as much power to fight surface water in its streets as the adjoining private owner, it is not ordinarily, if ever, liable for simply failing to provide culverts or gutters adequate to keep surface water off from adjoining lots *below grade*, particularly if the injury would not have occurred had the lots been filled up so as to have been on a level with the street."

In the case of *Morris v. City of Council Bluffs*, 67 Iowa, 343, 25 N. W. 274, 56 Am. Rep. 343, the principle is laid down that the owner of a lot below grade must take notice of any exposure created by bringing a street to grade, and must exercise reasonable diligence to protect himself from injury by an overflow of water by bringing his lot to grade.

In the case of *Bronson v. Borough of Wallingford,* 54 Conn. 513, 9 Atl. 394, the court says:

"The intent charged we consider as an intent simply to change the grade, and not a malicious intent to injure the plaintiff. Surface water must be turned from the roadbed into drains and gutters, and at all times will flow in considerable quantity. It would be practically impossible for towns, cities, and boroughs in most cases to prevent such water from flowing onto the land of adjoining proprietors."

In the case of *Aicher v. City of Denver,* 10 Colo. App. 413, 52 Pac. 87, there being what was termed a gulch or drain involved, and the facts being quite similar to this case, the court held:

"Where one erects improvements on land which is below the grade which the city authorities established, the failure of such authorities to provide for disposition of surface waters does not, as a rule, impose any liability on the city."

In the case of *Jordan v. Benwood,* 42 W. Va. 312, 26 S. E. 266, 36 L. R. A. 519, 57 Am. St. Rep. 859, there being a drain involved, and the facts similar to this case, the court held:

"A city is not liable for damages to a lot owner because change of grade of a street prevents surface water of the lot from flowing off. It is not different, even if the surface water is, by reason of such change of grade, increased in quantity on the lot, if not cast in a mass or body on the premises. Nor is a city liable for mere surface water flowing from a street upon an adjoining lot."

See, also, *Dudley v. Buffalo,* 73 Minn. 347, 76 N. W. 44; *Flagg v. Worcester,* 13 Gray (Mass.) 601; *Carll v. Northport,* 11 App. Div. 120, 42 N. Y. Supp. 576; *Corcoran v. City of Benicia,* 96 Cal. 1, 30 Pac. 798, 31 Am. St. Rep. 171; *Rychlicki v. City of St. Louis,* 98 Mo. 497, 11 S. W. 1001, 4 L. R. A. 594, 14 Am. St. Rep. 651; *Imler v. Springfield,* 55 Mo. 119, 17 Am. Rep. 645; *Stewart v. City of Clinton,* 79 Mo. 612; *St. Louis v. Gurno,* 12 Mo. 414; *Miller v. Mayor of Morristown,* 47 N. J. Eq. 62, 20 Atl. 61; *Durkes v. Town of Union,* 38 N. J. Law, 21; *Lynch v. New York,* 76 N. Y. 60, 32 Am. Rep. 271; *Rutherford v. Village of*

*Holley,* 105 N. Y. 632, 11 N. E. 818; *Wakefield v. Newell,* 12 R. I. 75, 34 Am. Rep. 598; *Yeager v. Fairmont,* 43 W. Va. 259, 27 S. E. 234; *Jorden v. Benwood,* 42 W. Va. 312, 26 S. E. 266, 36 L. R. A. 519, 57 Am. St. Rep. 859; *Roll v. Augusta,* 34 Ga. 326; *Bronson v. Wallingford,* 54 Conn. 513, 9 Atl. 393; *Clark v. City of Wilmington,* 5 Har. (Del.) 244; *Turner v. Dartmouth,* 13 Allen (Mass.) 291; *Emery v. Lowell,* 104 Mass. 13; *Hubbard v. Webster,* 118 Mass. 599; *Keith v. Brockton,* 136 Mass. 119; *Gannon v. Hargadon,* 10 Allen (Mass.) 106, 87 Am. Dec. 625; *Alden v. Minneapolis,* 24 Minn. 262.

In making the improvements complained of, the city as agent of the sovereignty was performing a public duty authorized by law, and obviously, so long as it was done with care and skill, there can be recovery for consequential damages only when authorized by statute. In this case there is neither any allegation in the pleadings nor contention in the proof of any negligence on the part of the city. The case of *Chicago, Rock Island & Pacific Ry. Co. v. Groves, ante,* this volume, 93 Pac. 755, is not applicable to the facts in this case. Even if it were, the drain or draw as shown in this record would not be termed a "waterway" or "water course" under the rule therein announced. There is nothing to show that the draw existed prior to the extension of the city limits over this area. But it does appear that this draw, drain or ditch, as you may term it, changed its base, or had been changed by the proprietors, as improvements were made by such adjacent proprietors. A surface water channel or waterway must have some long prior existence, so as to show that it existed from permanent natural causes and not from changes made incident to the conditions of a city, before it can come within the rule of that case.

We conclude that it was the intention of the Legislature in section 443, Wilson's Rev. & Ann. St. 1903, to provide for compensation only for owners of abutting property having permanent improvements erected thereon, where change was made in a permanent grade previously established by lawful authority; and compensation not being provided for such proprietors where the

establishment of the original or first grades are made by such authority, the plaintiff was not entitled to recover in this case.

Judgment of the court below is affirmed.

All the Justices concur.